19 N.J. Super. 570 (1952)
89 A.2d 71
ROSE M. SPERLING, PLAINTIFF-APPELLANT,
v.
BERNARD A. SPERLING, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 1952.
Decided May 21, 1952.
*572 Before Judges EASTWOOD, BIGELOW and FRANCIS.
Mr. Ira D. Dorian argued the cause for the plaintiff-appellant.
Mr. Benjamin M. Ratner argued the cause for the defendant-respondent.
The opinion of the court was delivered by FRANCIS, J.C.C.
In this action the plaintiff wife sought a judgment for separate maintenance. The complaint charged *573 the defendant husband with constructive abandonment and failure to support her and the two children of their marriage. After several hearings the trial court found that she had failed to establish either the constructive abandonment or the failure to support in accordance with his means.
The parties, who are first cousins, were married on October 21, 1936, in Poland. At the time the wife, a United States citizen, was on a visit there and her prospective husband, whom she had never met before, was about to be discharged from the Polish army. After a few weeks acquaintance they married.
Three weeks later she returned home and in November, 1937, arranged and paid for his transportation to this country.
At the time of his arrival she had an apartment in Brooklyn and was working as a bookkeeper. He moved in. Almost from the beginning their marital life has been one of discord and marked by frequent separations for substantial periods. In fact, the record indicates that from November, 1937, until November 21, 1947, when the complaint was filed, they lived together for a total of three years and three months.
In support of her case plaintiff recited the history of their unhappy life, their frequent separations and the causes thereof, defendant's irresponsibility as a provider, and the physical and verbal acts and conduct which she claimed justified her occupancy of a separate bedroom after August 26, 1947. While we have given serious consideration to the adverse findings of the trial judge and to his opportunity to see and hear the witnesses, our independent study of the record has led to the conclusion that the greater weight of the credible testimony demonstrates both defendant's constructive abandonment and his delinquency in the matter of support.
Even though in separate maintenance actions corroboration of the plaintiff is not a prerequisite as it is in divorce actions (Zehrer v. Zehrer, 5 N.J. 53 (1950); Gerhold v. Gerhold, 109 N.J. Eq. 634 (E. & A. 1932); *574 Pinkinson v. Pinkinson, 92 N.J. Eq. 669 (E. & A. 1921)), substantial independent aid for her charges appears in the proof.
The evidence discloses that while defendant had a trade when he came to the United States, he was out of work for a protracted period. During this time, approximately five months, plaintiff supported him. When he finally obtained employment he gave her a very meager portion of his earnings. This produced difficulty between them and on November 30, 1938, after pregnancy had made it necessary for her to cease working, he left her. The leaving is conceded by defendant, who said he did so because she kept nagging him about money. On December 1, 1938, she caused his arrest for non-support and the records of the Domestic Relations Court of Kings County, New York, were introduced to confirm the fact.
In connection with these New York proceedings, testimony of the defendant about an assault and battery complaint, said to have been made against him by his wife, throws significant light on his credibility. This complaint was not referred to by the plaintiff at all nor made one of the acts of cruelty relied upon here; but he said that his wife had him arrested for an assault and battery alleged to have been committed one evening on the steps or platform of a Brooklyn, Manhattan Transit Company station. On being asked where he was that evening, he recalled clearly being at night school from 8 P.M. to 11 P.M., because he had been asked by the principal to "make a little speech in reference to the new country that I entered," and he made such a speech in the auditorium. He told this to the police who called the principal, verified the story, and released him immediately. His examination was not concluded on this day and upon the resumption thereof some time later, he furnished a new version of the incident. On this occasion he recalled that he had been in the Richmond Hospital that night. This he told to the police, and the doctor at the hospital gave him "a paper" that he was there, so he was released from jail *575 immediately. The record produced at this trial shows that the only complaint made was for non-support.
In any event the New York court ordered him to pay a small sum weekly. He was constantly in arrears in this payment, so much so that on March 25, 1941, at a time when married men with children were not being drafted, he was inducted because he was not providing adequate support for his wife and child.
On being discharged from the army by reason of a bronchial condition in March or April, 1944, plaintiff said he wrote to her asking to be taken back. She agreed and they resumed living together in her apartment in Newark, New Jersey, where she was employed. It was not successful. Before very long she said he began to abuse her physically, punching her about the head, and asserting he would continue to do so until she went crazy. He started to call her vile names and repeatedly demanded a divorce. Thereafter there followed a series of specific incidents about which she testified.
She became pregnant again and had to give up her employment. On learning of the pregnancy he hit her. On June 29, 1945, when she was five months pregnant, he beat her about the head with his fists to the extent that she fell unconscious in the hallway of their apartment. She was incapacitated for three days and thereafter made a complaint against him in the Fourth Precinct. Later she relented and dropped the charge.
In August, 1945, he beat her, and in October of the same year, because his dinner was not ready on time, he struck her with a mirror, breaking it and cutting her head. Thereafter, on March 31, 1946, and after the second child was born, during an argument he beat her severely about the head. Again a complaint was made to the police and the record was introduced to support her statement. On his plea to her the charge was withdrawn.
On July 12, 1946, she was again struck about the head and he forced a portion of a blanket in her mouth, causing her gums to bleed. Another complaint was filed in the police court; the record was introduced and it contained a specific *576 reference to the assault with the blanket. Defendant was arrested but plaintiff relented once more about pressing the criminal charge. However, the judge ordered him to surrender his key and leave the apartment. On July 17, 1946, she brought a proceeding in the Juvenile and Domestic Relations Court and a support order was entered.
In February, 1947, she had an abdominal operation. Then, following some treatment by a psychiatrist for what obviously was some form of neurosis, and, as she put it, being without money and needing a rest, she committed herself to Greystone Park as a voluntary patient. After a stay of four weeks she returned home.
The parties had been separated since July, 1946. However, she said that after her return home from Greystone Park her husband saw her frequently and asked to be taken back. She did so on August 15, 1947. The result was the same and on August 26, 1947, while they were riding in his car, in the course of an argument over a mailbox key, he struck her in the nose, fracturing it. Then he drove her to a drug store for treatment but refused to take her to a doctor. When they got home, she started to leave the house to go to the doctor and he struck her again, causing her to fall to the floor. She returned to their apartment where he called her vile names. After this they occupied separate rooms.
On August 30, 1947, Mrs. Sperling saw Dr. Max Yablonsky for the nose injury and gave him a history of having been struck by her husband. He arranged for the taking of X-rays which showed a fracture of the nasal bone. Both Dr. Yablonsky and Dr. Stephen Rozza, the X-ray specialist, testified in her behalf.
An atrocious assault and battery charge was made on October 27, 1947, and Sperling was arrested at the apartment. Upon being released on bail he returned home and finally packed his belongings and left on November 26, 1947. An indictment eventuated from the charge but trial resulted in defendant's acquittal.
*577 Aside from the support given plaintiff's case by the records of the various criminal complaints and by the doctors with respect to the nose fracture, further corroboration was furnished. A friend of the plaintiff, Mrs. Rose Shapiro, testified that she was present in the Sperling home when plaintiff called the police in July, 1946. On another occasion plaintiff asked if she could stay over night with her because she was afraid of her husband; on still another visit to the Sperling home, accompanied by her children, Mrs. Shapiro said it was a shame the way defendant spoke to his wife and the way he cursed at her.
Another independent witness, Mrs. Elinor Markowitz, lived on the floor above the parties. She testified that on one occasion, the date of which was not fixed, but seems to have been in 1947, at about 3 A.M., she heard Mrs. Sperling calling defendant's name and saying "please stop, stop." Later someone "thumped" down the stairs and out of the house, following which she heard plaintiff crying for hours. She said also that one day in August, 1947, she was hanging clothes on the line outside when she heard "smacks." She turned and saw Sperling grab his wife, who charged that he had attacked her and also that her nose hurt. This incident obviously relates to the day when plaintiff claims she was struck in the nose and then later tried to leave the house to go to the doctor.
Dr. Vincent J. Riggs, a specialist in neuro-psychiatry, examined Mrs. Sperling on October 26, 1947, two months after the nose incident. She gave him a long history of marital abuse, including the blow on the nose and said that she was at the breaking point. His examination disclosed that she was "perfectly sane," but "suffering from a severe neurosis due to the strain she had undergone through her wretched married life. I feel that she is entirely capable of taking care of her two children, as she did alone for a number of years. A complete separation from her husband is necessary to restore her to full health." He saw her again the night before his appearance as a witness. This was in January, *578 1949, more than a year after the separation, and at this time "she seemed cheerful, alert and entirely recovered."
The defendant denied ever "deliberately" striking his wife or abusing her. He claimed that she nagged him constantly about money and his failure to be a better provider; that she was mentally unstable and that their troubles were chargeable to her conduct. However, his testimony is not impressive. A few references to it and to his conduct illustrate the fact: speaking of his marriage, he said that after meeting the plaintiff in Poland everyone in the family talked him into marriage and "before I knew it I was married"; the first time he left his wife, that is, on November 30, 1938, her brother told him to do it; on being asked if upon his discharge from the Army in 1944 and while he was in the hospital he did not write his wife asking to come back with her, he couldn't remember "but I have written letters because the doctors there insisted that I do it"; in 1947 he visited two lawyers who represented his wife. He said each one told him to get out of the house. The first lawyer, a Mr. Gottfried, told him he had a "lot of things up his sleeve" he would do if the request was not complied with. Testifying later about the other attorney, the one who filed this complaint, he asserted, this attorney told him if he didn't remove himself from the house "he had so many tricks up his sleeve that I never saw before" and which he would use. On one occasion when Sperling sent a support check to his wife by mail he directed the envelope to her at the "Seth Boyden Apartments for the Poor"; in spite of his protestations about interest in the children, he had not exercised his right of visitation for a period of six months during the trial; he tried to create the impression that one of plaintiff's brothers might have given her the fractured nose more than two months before August 26, 1947, in the face of the clear medical testimony that on August 30, 1947, the condition could not have existed more than a week because there was no tendency to healing present and no callous formation present as shown by the X-rays; and in his answer in this proceeding he *579 charged that his wife is morally unfit to have custody of the children. But promptly at the hearing his counsel said there was no request for a change in custody and not the slightest evidence of moral unfitness was offered.
There can be no serious question about the violation of his duty to provide support. He was in difficulty about it in New York and constantly in arrears in the court-directed payments. His induction into the army was produced by this irresponsibility. After his army service, while he had some disability which seems to have decreased with time, the testimony is not at all persuasive that his failure to take care of his family was chargeable to it alone. He was in default in his payments under the Essex County Domestic Relations Court support order and it was necessary to hold him in contempt to obtain compliance with the order for maintenance pendente lite in this action.
On the whole record in our judgment the greater weight of the evidence compels the conclusion that the defendant husband has been guilty of such extreme cruelty as endangered the health or life of his wife and which rendered her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. Zehrer v. Zehrer, 5 N.J. 53, 58 (1950); Egnozzi v. Egnozzi, 17 N.J. Super. 433 (App. Div. 1952); Smith v. Smith, 96 N.J. Eq. 59, 60 (Ch. 1924); Wines v. Wines, 97 N.J. Eq. 55, 57 (Ch. 1924); Restaino v. Restaino, 110 N.J. Eq. 563, 565 (E. & A. 1932); Burke v. Burke, 113 N.J. Eq. 77, 78 (E. & A. 1935); Yorn v. Yorn, 138 N.J. Eq. 608 (E. & A. 1946); Herr, Marriage, Divorce and Separation, Secs. 755, 766, 1402. This justified separating herself from him and made him chargeable with constructive abandonment.
Condonation was not pleaded by the defendant in his answer as it should have been if he intended to rely upon it as a defense. Wallace v. Wallace, 112 N.J. Eq. 292 (E. & A. 1933); Rule 3:8-3. But there was no effort on the part of plaintiff at the trial to oppose the introduction of proof of sexual relations, and the trial court found Mrs. Sperling *580 guilty of condonation. The record does not support the finding. The conclusions say:
"I must further find that any acts of violence, if committed, were condoned by sexual intercourse indulged in between the parties on or about August 15, 1947, and that no matrimonial offense has been testified to or proved since that date which would breach such condonation."
Plaintiff testified that the last sexual intercourse occurred on August 17, 1947; defendant did not deny it. The assault which resulted in the fractured nose took place on August 26, 1947. The previous condonation, being a conditional pardon, was revoked thereby. Bravo v. Bravo, 93 N.J. Eq. 56 (Ch. 1921); Leech v. Leech, 82 N.J. Eq. 472 (Ch. 1913); Warner v. Warner, 31 N.J. Eq. 225 (Ch. 1879).
The statutory requisites of abandonment and failure to support were amply established by the plaintiff and she is entitled to a judgment for separate maintenance.
It appears that defendant is now in the interior decorating business and largely engaged in making slip covers. The statement of an accountant who examined his books in behalf of the plaintiff was admitted in evidence. It shows gross earnings for the year 1950 of $6,687.84, and net earnings of $5,313.99, including a Veterans Administration disability allowance of $1,046.10. Since that time the disability allowance has been cut to $45 per month. He operates an automobile, had a vacation in Florida in the winter of 1949, and maintains a safe deposit box. The box is used primarily to safeguard some bonds for the children; no cash is kept there, according to his testimony.
Plaintiff is 37 years of age and has two young children in her custody. She is allowed $30 a week for the maintenance of herself and her children, exclusive of the portion of defendant's disability allowance which she is presently receiving.
Further, a counsel fee of $350 is allowed to her counsel for work done on this appeal. Defendant is directed also to *581 pay the cost of the transcript. The remaining problems, such as the payment of doctors' and dentist bills and the like, and the determination of arrearages, if any, under the pendente lite order, shall be presented to the trial court on the filing of the mandate.
The determination in favor of defendant is reversed and the record is remanded for the purpose of having judgment entered for the plaintiff in accordance herewith.